UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

EARL KISTNER,

              Plaintiff,

    v.                                 21-CV-526-LJV-JJM
                                        DECISION & ORDER

CITY OF BUFFALO, *et al.*,

              Defendants.

_____


On April 20, 2021, the plaintiff, Earl Kistner ("Earl"), commenced this action under

42 U.S.C. § 1983 and New York State law.  Docket Item 1.  He has sued the City of

Buffalo; Byron Lockwood, Commissioner of the Buffalo Police Department ("BPD"); and

several BPD Officers: Lauren McDermott, Jenny Velez, Karl Schultz, and Kyle Moriarity.

*Id.*  The action arises from a January 1, 2017 incident in which a patrol car driven by

defendant McDermott allegedly struck Earl's father, James Kistner ("James").  *Id.*  Earl

alleges that after the collision, the officers unlawfully seized him and his property and

subjected him to excessive force.  *Id.*[1]

On May 20, 2021, the defendants moved for judgment on the pleadings on some

claims.  Docket Item 5.  A few weeks later, the case was referred to United States

Magistrate Judge Jeremiah J. McCarthy for all proceedings under 28 U.S.C. §

---

[1] James also sued the defendants here, as well as several other BPD
employees, in connection with the January 1, 2017 incident.  *See Kistner v. The City of
Buffalo, et al.*, 18-cv-402-LJV-JJM.  That action remains pending before this Court.

Throughout this opinion, the Court refers to James and Earl by their first names
to distinguish between them.

636(b)(1)(A) and (B).  Docket Item 7.  In the meantime, on June 4, 2021, Earl

responded to the defendants' motion to dismiss and moved to strike the exhibits

attached to that motion.  Docket Item 6.  On July 6, 2021, the defendants replied to

Earl's response and responded to his motion to strike, Docket Item 9, and on July 12,

2021, Earl replied, Docket Item 10.  Judge McCarthy then converted the defendants'

motion for judgment on the pleadings into a motion for summary judgment and denied

Earl's motion to strike as moot.  Docket Item 12.[2]

On September 16, 2021, while the defendants' converted motion was pending,

Earl cross-moved for partial summary judgment.  Docket Item 16.  On January 13,

2022, the defendants submitted papers responding to Earl's motion and in further

support of their converted motion; they also moved for summary judgment on Earl's

unlawful-seizure, failure-to-intervene, and retaliation claims.  Docket Item 24.  On

January 27, 2022, Earl replied and moved to amend his complaint.  Docket Item 25.

On February 28, 2022, Judge McCarthy heard oral argument on all the pending

motions.  *See* Docket Item 32.  That same day, Judge McCarthy granted Earl's motion

to amend his complaint.  Docket Item 33.  Ten days later, Earl amended his complaint.

Docket Item 34.

On March 28, 2022, Judge McCarthy issued a Report and Recommendation

("R&R") recommending that Earl's motion for summary judgment be denied and that the

---

[2]  The order converting the defendants' motion for judgment on the pleadings into a motion for summary judgment converted only those parts of the motion that relied on materials outside the pleadings.  *See* Docket Item 12.  Judge McCarthy analyzed the rest of the motion as a motion to dismiss, *see* Docket Item 35 at 22-23, and this Court does as well. This Court therefore analyzes the defendants' first motion, Docket Item 5, as a motion for summary judgment only on Kistner's excessive force and assault and battery claims.

defendants' motion for judgment on the pleadings and converted motion for summary judgment be granted in part and denied in part.  Docket Item 35.  On May 20, 2022, both sides objected to the R&R, Docket Item 40 (defendants' objections) and Docket Item 41 (Earl's objections); on June 13, 2022, both sides responded, Docket Item 43 (defendants' response) and Docket Item 44 (Earl's response); and on June 24, 2022, both sides replied, Docket Item 45 (defendants' reply) and Docket Item 46 (Earl's reply).

A district court may accept, reject, or modify the findings or recommendations of a magistrate judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).  The court must review *de novo* those portions of a magistrate judge's recommendation to which a party objects.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3).

This Court has carefully and thoroughly reviewed the R&R; the record in this case; the objections, responses, and replies; and the materials submitted to Judge McCarthy.  Based on that *de novo* review, Earl's motion for summary judgment is denied, and the defendants' motions for judgment on the pleadings and for summary judgment are denied in part and granted in part.

## FACTUAL BACKGROUND[3]

James owns a home at 33 Schmarbeck Avenue.  Docket Item 16-16 at ¶ 2; Docket Item 24 at ¶ 2.  On the morning of January 1, 2017, Officers Schultz and

---

[3] On a motion for summary judgment, the court construes the facts in the light most favorable to the non-moving party.  *See Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  The following facts are taken from Earl's statement of undisputed material facts, Docket Item 16-16; the defendants' response to Earl's statement of undisputed material facts, Docket Item 24; and the exhibits incorporated in the parties' filings.  The Court construes those facts in favor of the non-moving party with respect to all motions. And the Court assumes the reader's familiarity with the facts alleged in the amended

Moriarity arrived at 33 Schmarbeck to respond to a complaint about a theft.  Docket Item 16-16 at ¶¶ 1, 4; Docket Item 24 at ¶¶ 1, 4.  A short time later, Officers McDermott and Velez arrived in a separate vehicle driven by McDermott.  Docket Item 16-16 at ¶ 6; Docket Item 24 at ¶ 6.

Earl and James, who were inside a nearby home at 37 Schmarbeck, saw the officers and went outside to learn why the officers were there.  Docket Item 16-16 at ¶¶ 7, 8; Docket Item 24 at ¶¶ 7, 8.  James walked toward the police cars while Earl stayed on the sidewalk.  Docket Item 16-16 at ¶ 8; Docket Item 24 at ¶ 8.  As James walked toward McDermott's vehicle, James and the vehicle collided and James fell to the ground.  Docket Item 16-16 at ¶ 9; Docket Item 24 at ¶ 9.  James then asked Earl to call an ambulance.  Docket Item 16-16 at ¶ 10; Docket Item 24 at ¶ 10.

The parties dispute what happened next.

Earl says that after he ran into the street to help his father, he went back inside 37 Schmarbeck to get his cell phone so that he could call an ambulance.  Docket Item 16-16 at ¶ 11.  According to Earl, after he exited 37 Schmarbeck, he did not enter the roadway.  *Id.* at ¶ 12.  He says that he called 911 to request an ambulance, and that when Schultz heard him making the request, Schultz "veered away from the other officers, engaged Earl in conversation, and motioned for Earl" to approach him.  *Id.* at ¶ 13.

When Earl turned and walked away with his phone to his ear, he says, Schultz grabbed him by the left arm, "forced [him] out into the middle of the road," and

_____

complaint, Docket Item 34, and with Judge McCarthy's analysis and recitation of the factual background in the R&R, Docket Item 35.

attempted to take the phone from him. *Id.* at ¶¶ 14-15. Earl claims that when he again turned away from Schulz, he was "forcibly grabbed by . . . Schultz and Moriarity," who "pushed Earl back and forth between [them]" as all four officers surrounded Earl and Schultz grabbed the phone. *Id.* at ¶¶ 15-16. Earl says that Schultz then seized his driver's license. *Id.* at ¶ 19.

The defendants recall things differently. First, they contest Earl's statement that he "did not enter the roadway" when he reapproached the scene, claiming instead that Earl "st[ood] in the street, on the curb, or at the edge of the curb." Docket Item 24 at ¶ 12. Although the defendants agree that "someone called 911" to request an ambulance, they deny that Schultz heard Earl make that request. *Id.* at ¶ 13. Instead, they say, Schultz motioned for Earl to approach him because Earl did not comply with the officers' orders to "stay over on the sidewalk" and "leave the immediate area." *Id.* at ¶ 14.

The defendants agree that when Earl walked away, Schultz followed him and "held [Earl's] left arm as [Schultz] escorted [Earl] to the middle of the street." *Id.* They admit that "[Earl] and the four officers were all in close proximity to each other in the street for a period of time," but they say that Schultz and Moriarty only "lightly grabbed [Earl] to gain control of him" because Earl had pulled away and Earl's phone "was an officer safety concern." *Id.* at ¶¶ 15-16. And they say that Earl voluntarily emptied his pockets when asked to do so and gave Schultz his phone and license. *Id.* at ¶¶ 15, 19; *id.* at 13.

Both sides agree that Schultz then brought Earl's driver's license to Schultz's vehicle, ran a warrant search, returned the license and phone to Earl, and allowed Earl

to leave.  Docket Item 16-16 at ¶¶ 19-20; Docket Item 24 at ¶¶ 19-20.  And both sides agree that Schultz canceled an ambulance request, Docket Item 16-16 at ¶ 17; Docket Item 24 at ¶ 17, although the defendants note that they thought James was not seriously injured and believed that taking him to the hospital themselves "would be quicker than waiting for an ambulance," Docket Item 24 at ¶ 17.

## PROCEDURAL BACKGROUND

On April 20, 2021, Earl commenced this action, alleging violations of his First, Fourth, and Fourteenth Amendment rights under section 1983 and bringing several claims under state law.  Docket Item 1.  More specifically, he asserts several claims under section 1983 against the on-scene officers, including claims that Moriarity and Schultz used excessive force against him, Docket Item 34 at 15; claims that McDermott and Velez failed to intervene, *id.* at 16-17; and claims that all four officers unlawfully seized him and his property, *id.* at 13-14, and retaliated against him in violation of his First Amendment rights, *id.* at 17-18.  He also asserts a section 1983 claim against Lockwood for negligent hiring and failing to supervise and train, *id.* at 18-20, as well as a *Monell* claim against the City of Buffalo in connection with all the other alleged section 1983 violations, *id.* at 20-22.  Finally, he asserts claims against Moriarity, Schultz, and the City of Buffalo under New York State law for assault and battery.  *Id.* at 22-24.[4]

---

[4] Earl originally brought several other claims, alleging conspiracy to violate his constitutional rights, intentional infliction of emotional distress, and negligent infliction of emotional distress, as well as official-capacity claims against the individual defendants and a claim for punitive damages against the City of Buffalo.  Docket Item 1.  But as Judge McCarthy noted in the R&R, the amended complaint does not include those claims.  Docket Items 34 and 35.  This Court therefore deems those claims to be

The defendants initially moved for judgment on the pleadings on Earl's section 1983 claims against Lockwood and the City of Buffalo as well as his claims for excessive force, assault, and battery.  Docket Item 5-1.  After Judge McCarthy converted the defendants' motion into a motion for summary judgment, Docket Item 12, Earl moved for summary judgment on his claims for unlawful seizure, retaliation, failure to intervene, and assault and battery.  Docket Item 16-17.  The defendants then submitted a memorandum of law in opposition to Earl's summary judgment motion and in support of their converted motion for summary judgment.  Docket Item 24.  In that filing, the defendants also moved for summary judgment on Earl's unlawful-seizure, retaliation, and failure-to-intervene claims.  *Id.*[5]

In the R&R, Judge McCarthy first noted that the parties' motions "preceded the exchange of any discovery in this action and rely on the discovery exchanged in [James's] action."  Docket Item 35 at 1-2.  He then addressed Earl's unlawful-seizure claims and recommended denying Earl's motion for summary judgment on those claims with respect to the seizure of both Earl's person, *id.* at 6-12, and Earl's property, *id.* at 12-15.

---

withdrawn and accepts Judge McCarthy's recommendation to deny as moot the portions of the defendants' motion addressing those claims.

Additionally, Earl agrees that because his unlawful-seizure claim arises under the Fourth Amendment, "dismissal of [his] . . . unlawful seizure claim under the Fourteenth Amendment is proper."  Docket Item 6-2 at 2 n.1.  Earl's Fourteenth Amendment unlawful-seizure claim therefore is dismissed.

[5] Judge McCarthy did not address the defendants' motion for summary judgment on these claims, *see* Docket Item 35, "presumably because [the] defendants did not move on [these claims] in their . . . motion for judgment on the pleadings," *see* Docket Item 40 at 2-3.  But because the defendants moved on the remaining claims in their response to Earl's motion, this Court considers that motion in the first instance.

Judge McCarthy next turned to the parties' dueling motions on Earl's excessive force claim and recommended denying Earl's motion for summary judgment and granting the defendants' converted motion for summary judgment. *Id.* at 15-20. He then recommended denying Earl's motion for summary judgment on the failure-to-intervene claim "[t]o the extent that [Earl] has not established his entitlement to judgment on any of his constitutional claims." *Id.* at 20-21.

Judge McCarthy also recommended denying Earl's motion for summary judgment on his First Amendment retaliation claim, *id.* at 21-22, and granting the defendants' motion to dismiss Earl's supervisory liability claims against Lockwood, *id.* at 22-23. But he recommended denying the defendants' motion to dismiss Earl's *Monell* claims as moot because Earl "ha[d] since been granted leave to file an [a]mended [c]omplaint." *Id.* at 24. Finally, Judge McCarthy recommended denying both sides' motions for summary judgment on Earl's assault and battery claims. *Id.* at 24-26.

Both Earl and the defendants then objected to the R&R as noted above.

## LEGAL PRINCIPLES

### I.    MOTION FOR JUDGMENT ON THE PLEADINGS

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." The standard for deciding a Rule 12(c) motion is "the same . . . standard [that applies] to dismissals pursuant to [Rule] 12(b)(6). Thus, [courts] will accept all factual allegations in the [c]omplaint as true and draw all reasonable inferences in [the plaintiff's] favor." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011). "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

8

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).

## II.    SUMMARY JUDGMENT

"A motion for summary judgment may be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)).  "Summary judgment is appropriate when 'there can be but one reasonable conclusion as to the verdict,' *i.e.*, 'it is quite clear what the truth is,' and no rational factfinder could find in favor of the nonmovant."  *Id.* (first quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986), then quoting *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467 (1962)).  Conversely, "[s]ummary judgment should be denied if, when the party against whom summary judgment is sought is given the benefit of all permissible inferences and all credibility assessments, a rational factfinder could resolve all material factual issues in favor of that party."  *Id.*  "In deciding such a motion, the court cannot properly make credibility determinations or weigh the evidence."  *Id.*

## DISCUSSION

## I.    UNLAWFUL SEIZURE

Earl alleges that the defendants unlawfully seized him and his personal property—his cell phone and driver's license—in violation of the Fourth Amendment.

Docket Item 34 at 13-14.  Both sides moved for summary judgment on these claims.
Docket Item 16-17 at 9-11 (Earl's motion); Docket Item 24 at 11-13 (defendants'
motion).  Judge McCarthy recommended denying Earl's motion for summary judgment
on the unlawful-seizure claims, Docket Item 35 at 6-15, but both Earl and the
defendants objected to Judge McCarthy's analysis, arguing that he should have
recommended granting their respective motions, Docket Item 40 at 2-4 (defendants'
objections); Docket Item 41 at 5-7 (Earl's objections).

This Court agrees with Judge McCarthy that there remain questions of fact
surrounding Earl's unlawful-seizure claims.  And those questions of fact preclude
summary judgment for either side.

### A.   Seizure of Earl's Person

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the
[g]overnment, and its protections extend to brief investigatory stops . . . that fall short of
traditional arrest," often called *Terry* stops.  *United States v. Arvizu*, 534 U.S. 266, 273
(citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968); *United States v. Cortez*, 449 U.S. 411, 417
(1981)).  "[I]n such cases, the Fourth Amendment is satisfied if the officer's action is
supported by reasonable suspicion to believe that criminal activity 'may be afoot.'"  *Id.*
(citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989).  In other words, an officer who
conducts a *Terry* stop must have "a reasonable basis to think that the person to be
detained is committing or has committed a criminal offense."  *Dancy v. McGinley*, 843
F.3d 93, 106 (2d Cir. 2016) (citations and internal quotation marks omitted).

In evaluating whether an officer had reasonable suspicion to stop an individual,
courts "take into account the totality of the circumstances supporting the investigatory

stop and evaluate those circumstances through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *Id.* (citations and internal quotation marks omitted). The reasonable suspicion standard is "not high," but it does "demand[] 'specific and articulable facts which, taken together with rational inferences from those facts,' provide detaining officers with a 'particularized and objective basis for suspecting legal wrongdoing.'" *United States v. Singletary*, 798 F.3d 55, 59-60 (2d Cir. 2015) (first quoting *Terry*, 392 U.S. at 21, then quoting *Arvizu*, 534 U.S. at 273).

"[I]f the police conduct a limited investigative detention, they have qualified immunity so long as they had at least *arguable* reasonable suspicion to warrant the limited detention." *Ozga v. Elliot*, 150 F. Supp. 3d 178, 189 (D. Conn. 2015) (emphasis in original) (citing *Whittier v. Kobayashi*, 581 F.3d 1304, 1308 (11th Cir. 2009) (per curiam)). "When analyzing an officer's claim for qualified immunity in the context of an investigatory stop, [courts] examine whether '(a) it was objectively reasonable for the officer[] to believe reasonable suspicion existed or (b) officers of reasonable competence could disagree on whether the reasonable suspicion test was met.'" *Cox v. Village of Pleasantville*, 271 F. Supp. 3d 591, 614 (S.D.N.Y. 2017) (quoting *Sutton v. Duguid*, 2007 WL 1456222, at *6 (E.D.N.Y. May 16, 2007)).

Here, the defendants say that they had license to detain Earl because they reasonably suspected him of obstructing governmental administration. Docket Item 24 at 11-13; Docket Item 28 at 2-3. "A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs[,] or perverts the administration of law or other governmental function or prevents or attempts to prevent a public

servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act." N.Y. Penal Law § 195.05. This offense requires three elements: "(1) a public servant [who] is performing an official function [that is authorized by law]; (2) [an] individual [who] prevents or attempts to prevent the performance of that function by interfering with it; and (3) [that] the individual does so intentionally." *Kass v. City of New York*, 864 F.3d 200, 206-07 (2d Cir. 2017).

The interference "must at least in part be 'physical'": "[t]his element of the statute is satisfied when an individual 'intrude[s] himself into, or get[s] in the way of, an ongoing police activity." *Id.* at 209-10 (quoting *In re Kendall R.*, 71 A.D.3d 553, 897 N.Y.S.2d 83, 84 (1st Dep't 2010)). But courts disagree about whether the physical interference can be passive. Some courts in this Circuit have found that "[a]n officer has probable cause to arrest for obstructing governmental administration where a person refuses to comply with an order from a police officer." *See, e.g.*, *Murray v. Ruderfer*, 2017 WL 1194371, at *5 (S.D.N.Y. Mar. 31, 2017) (citations omitted). But others have held that "[d]isobeying a police officer alone is not necessarily [obstruction of governmental administration]." *See, e.g.*, *Graham v. City of New York*, 128 F. Supp. 3d 681, 709-10 (E.D.N.Y. 2015).

The defendants argue that their seizure of Earl did not violate the Fourth Amendment because they had reasonable suspicion—or at least arguable reasonable suspicion sufficient to confer qualified immunity—to believe that Earl was obstructing governmental administration. Docket Item 24 at 11-13; Docket Item 28 at 2-3. This reasonable suspicion, they say, was based on Earl's "fail[ure] to follow the officers' instructions to stand on the sidewalk and step back from the immediate vicinity of the scene while they completed their investigation." Docket Item 24 at 11-13; Docket Item

28 at 2-3.  But Earl argues that the officers seized him only when they realized that he was calling an ambulance and not because they thought he was interfering with their work.  Docket Item 25-4 at 4-6.  Further, he says that he did comply with the instructions to "stand on the sidewalk and step back from the immediate vicinity of the scene" and that no reasonable officer could have believed that Earl was obstructing governmental administration.  *Id.*; Docket Item 41 at 6-7.[6]

To support their respective arguments, both sides cite surveillance footage from two cameras mounted at 37 Schmarbeck that captured much—though not all—of the incident.  *See* Docket Item 16-16 at ¶ 3; Docket Item 24 at ¶ 3.  But the video of Earl's interaction with the officers is not as clear as either side suggests.

The video shows that after Earl reemerged from 37 Schmarbeck, he slowly walked toward the road but stopped at the curb, some distance away from the officers and his father.  It is difficult to say with certainty whether Earl was in the road, on the curb, or on the grass.  But it is clear that Earl remained in one spot, stationary, for about fifteen seconds, before Schultz approached him and Earl turned to walk away.  By the time Schultz grabbed Earl's arm, Earl was standing on the sidewalk.

It does not appear to this Court that Earl physically interfered with the officers' investigation.  It is possible, however, that he disobeyed their instructions by standing

---

[6] Earl also argues that the first element of obstruction of governmental administration—a public servant performing an official function that is authorized by law, *Kass*, 864 F.3d at 206-07—is not present here because James's arrest was unlawful, Docket Item 25-4 at 6-7; Docket Item 41 at 5-7.  Therefore, Earl says, the officers could not have reasonably suspected he was committing that offense.  Docket Item 25-4 at 6-7; Docket Item 41 at 5-7.  But that argument is premature: James's false arrest claim has yet to be adjudicated.  *See Kistner v. City of Buffalo*, 2022 WL 16797986, at *8-13 (W.D.N.Y. Nov. 8, 2022).

near the edge of the curb.  And if he did disobey the officers' orders, the officers may have had reasonable suspicion—or at least arguable reasonable suspicion—to believe that Earl was obstructing governmental administration.  So this Court agrees with Judge McCarthy that questions of fact preclude summary judgment for Earl on his claim for unlawful seizure of his person.  *See* Docket Item 35 at 10-12.

And those same questions of fact preclude summary judgment for the defendants.  Schultz's testimony about the incident is punctuated with phrases suggesting that he does not recall exactly what instructions he gave Earl.  *See* Docket Item 16-4 at 123 ("Initially it was just to, you know, stay back, you know, over there, on the sidewalk.  Just to not interfere with, you know, what was going on."); *see also* Docket Item 44 at 3 (arguing that there are questions of fact surrounding the content of Schultz's instructions to Earl).  And that uncertainty raises questions about what Schultz told Earl to do.  If Schultz told Earl to stand "on the sidewalk," *see* Docket Item 16-4 at 123, Earl may well have disobeyed that order.  But if Schultz told Earl "just to . . . stay back" or "[j]ust to not interfere," *see id.*, Earl likely complied with that order.[7]

These questions of fact about Schultz's instructions and Earl's compliance with those instructions preclude summary judgment at this stage.  Both sides' motions for summary judgment on Earl's claim for unlawful seizure of his person therefore are denied.

---

[7] In fact, the video conclusively disproves Schultz's claim that Earl "refused . . . to stay back," Docket Item 16-4 at 152; on the contrary, Earl's only move after he stopped on the curb was to turn *away* from the scene.

**B.    Seizure of Earl's Property**

Earl also claims that the defendants unlawfully seized his cell phone and driver's license.  Docket Item 16-17 at 9-11.  The defendants advance two arguments in response.  First, they say that Earl voluntarily gave them his phone and license.  Docket Item 24 at 13.  Second, they argue that they were permitted to seize Earl's property because they reasonably suspected that Earl was obstructing governmental administration.  *Id.* at 12-13.  But Earl says that he did not voluntarily produce his license and phone, Docket Item 16-16 at ¶¶ 16, 19, and that the officers did not have the reasonable suspicion necessary to seize his property, Docket Item 25-4 at 5.

**1.    Voluntariness**

"A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property."  *United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). But "an officer may seize private property 'without violating the Fourth Amendment if the owner [] voluntarily gives consent.'"  *Newsome v. Bogan*, 2022 WL 2974098, at *8 (W.D.N.Y. July 27, 2022) (quoting *United States v. Peterson*, 100 F.3d 7, 11 (2d Cir. 1996)).  And "[i]n a consensual encounter, . . . officers . . . may make requests for identification."  *Peterson*, 100 F.3d at 10.

"Whether an individual has voluntarily given consent is essentially a fact-based inquiry that must be determined by the totality of all the circumstances."  *Id.* at 11 (citations and internal quotation marks omitted).  When evaluating whether an encounter with law enforcement is consensual, courts have considered such factors as an officer's tone of voice, *United States v. Drayton*, 536 U.S. 194, 204 (2002) (noting

15

that an officer spoke "in a polite, quiet voice"), an officer's body language, *id.* at 203-04 (noting that the same officer "did not brandish a weapon or make any intimidating movements" and left space clear for individuals being questioned to leave), and whether the officer "advised the [individual being questioned] that he could refuse consent," *id.* at 202 (citing *Florida v. Bostick*, 501 U.S. 429, 432 (1991)).

The defendants argue that no Fourth Amendment violation occurred with respect to Earl's property because Earl "gave [] Schultz his phone," "emptied his pockets[,] and produced his driver's license voluntarily."   Docket Item 24 at 13.   But Earl disputes these claims, alleging that Schultz "confiscated his cell phone and driver's license."   Docket Item 16-17 at 10.

Earl concedes that during his deposition, he testified that he "gave [the defendants his] phone."   Docket Item 25-4 at 5 (quoting Docket Item 5-4 at 30).   But Earl also testified that the officers "took [his] phone," Docket Item 5-4 at 28, and he argues that "the videotape unmistakably shows that [] Schultz ripped the cell phone out of [his] hand," Docket Item 25-4 at 5.   Although the video is not as clear as Earl suggests, it certainly does not show him handing Schultz the phone; rather, Schultz appeared to reach for and take the phone while Earl had it to his ear.

On the other hand, the video footage does support the defendants' account of how Schultz obtained Earl's license: it shows that after the officers took Earl's phone, Earl reached into his pocket and handed something—presumably his license—to Schultz.   But the video does not conclusively establish that Earl voluntarily produced his license because the cameras did not record the audio of Earl's encounter with the defendants.   The defendants say that Schultz "*asked* [Earl] to empty his pockets of any

16

objects," Docket Item 24 at ¶ 19 (emphasis added), but neither side alleges exactly what Schultz said.  And because the voluntariness of Earl's actions "must be determined by the totality of all the circumstances," *see Peterson*, 100 F.3d at 11, Schultz's exact words—as well as his tone and body language—matter.

For example, Earl's relinquishment of his license may have been voluntary if Schultz simply asked to see it in a way that made it clear to Earl that he could refuse the request.  *See, e.g.*, *Drayton*, 536 U.S. at 200-01 ("Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, ask for identification, and request consent to search luggage—provided they do not induce cooperation by coercive means." (citing *Bostick*, 501 U.S. at 434-35)); *id.* at 203-04.  Conversely, if Schultz demanded that Earl empty his pockets and hand over his license, Earl may have understood that he had to comply or risk arrest—no real choice at all.  And the fact that Earl was surrounded by four uniformed officers—two of whom had already placed their hands on him and one of whom had his phone—makes that possibility even more likely.

For all those reasons, there are questions of fact about whether Earl voluntarily gave the defendants his phone and license, and neither side is entitled to summary judgment on Earl's claim for unlawful seizure of his property on that ground.

## 2.    Reasonable Suspicion

Alternatively, the defendants argue that they were permitted to seize Earl's property because they had a "concern for officer safety" based on their reasonable suspicion that Earl was obstructing governmental administration.  Docket Item 40 at 4.

During a *Terry* stop, an officer may conduct "a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual." *Terry*, 392 U.S. at 27.  An officer's subjective motivation for searching an individual does not matter; "the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.*  Courts have found that a cell phone can objectively be perceived as a threat to officer safety. *See, e.g.*, *Riley v. California*, 573 U.S. 373, 387 (2014) ("Law enforcement officers remain free to examine the physical aspects of a phone to ensure that it will not be used as a weapon—say, to determine whether there is a razor blade hidden between the phone and its case.").

Earl argues that the defendants' concern for officer safety was a mere pretense and that Schultz seized Earl's phone to prevent Earl from calling an ambulance. *See* Docket Item 41 at 9-10.[8]  But Schultz's subjective motivation is irrelevant to the question of whether he had the authority to seize Earl's phone. *See Terry*, 392 U.S. at 27.  If the officers conducted a lawful *Terry* stop, an objectively reasonable concern for officer safety justified seizing Earl's phone regardless of Schultz's actual reason for doing so. *See Riley*, 573 U.S. at 387.

---

[8] In support of this argument, Earl has provided the affidavit and report of John Campanella, a "law enforcement policies and procedures expert," who reviewed and reported on the defendant officers' conduct.  Docket Item 16-12.  Based on his review, Campanella concluded that "Schultz's reasoning . . . that he viewed [Earl's] actions as threatening and [that Earl's] possession of a cell phone posed an 'officer safety risk' [is] without merit." *Id.* at 33-34.  But this Court leaves to the jury the task of assessing the credibility of Campanella's testimony and report. *See Nimely v. City of New York*, 414 F.3d 381, 397-98 (2d Cir. 2005) ("It is a well-recognized principle of our trial system that determining the weight and credibility of a witness's testimony belongs to the jury." (alterations, citations, and internal quotation marks omitted)).

The question of whether Schultz's alleged seizure of Earl's phone was permissible therefore depends on whether the officers had reasonable suspicion—or at least arguable reasonable suspicion—to detain Earl.  And the same issues of fact that preclude summary judgment on Earl's claim for unlawful seizure of his person also preclude summary judgment on Earl's unlawful seizure claim as it relates to the seizure of his phone.

The same analysis applies to the defendants' argument that Schultz was permitted to "obtain [Earl's] driver's license and perform a warrants check" because the officers had reasonable suspicion to detain Earl.  Docket Item 40 at 4.  As Judge McCarthy noted, several circuits have held that obtaining an individual's license and running a warrant check falls within the scope of a lawful *Terry* stop.  Docket Item 35 at 13 (citing *United States v. Villagrana-Flores*, 467 F.3d 1269, 1275 (10th Cir. 2006); *Hall v. City of Chicago*, 953 F.3d 945, 953 (7th Cir. 2020)); *see also United States v. Young*, 707 F.3d 598, 606 (6th Cir. 2012) (citing *Klaucke v. Daly*, 595 F.3d 20, 26 (1st Cir. 2010)).  But since this Court cannot conclude as a matter of law that the officers conducted a valid *Terry* stop when they seized Earl, it likewise cannot conclude that the officers had the authority to seize Earl's license.

In sum, because questions of fact remain about whether the officers had reasonable suspicion to detain Earl, neither side is entitled to judgment as a matter of law on Earl's claim for unlawful seizure of his property.  The parties' motions for summary judgment on Earl's claim for unlawful seizure of his property therefore are denied.

## II.  EXCESSIVE FORCE

Excessive force claims are "analyzed under the Fourth Amendment and its reasonableness standard."  *Ketcham v. City of Mount Vernon*, 992 F.3d 144, 148 (2d Cir. 2021) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  "Police officers' application of force is excessive, in violation of the Fourth Amendment, if it is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'"  *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (quoting *Connor*, 490 U.S. at 397); *see also Connor*, 490 U.S. at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.").  But "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  *Connor*, 490 U.S. at 396 (citation and internal quotation marks omitted).

"Examining the reasonableness of the force used 'requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether [the suspect] is actively resisting arrest or attempt to evade arrest by flight.'"  *Ketcham*, 992 F.3d at 148-49 (quoting *Connor*, 490 U.S. at 396) (alterations in original).  Some courts have held that a plaintiff who has not suffered any injury cannot sustain an excessive force claim.  *See* Docket Item 35 at 17 (citing *Smalls v. Cnty. of Suffolk*, 2019 WL 4038742, at *15 (E.D.N.Y. Aug. 27, 2019); *Rogers v. Miller*, 2019 WL 3429767, at *6-7 (E.D.N.Y. July 30, 2019); *Walzer v. Town of Orangetown*, 2015 WL 1539956, at *10 (S.D.N.Y. Apr. 7, 2015); *Sethi v. Nassau Cnty.*, 2014 WL 2526620, at *5 (E.D.N.Y. June 3, 2014)).  But other courts have held that there are

some circumstances in which no use of force—even *de minimis* force—is reasonable because no force at all is required. *Id.* at 17-18 (citing *Amato v. City of Saratoga Springs*, 170 F.3d 311, 317 (2d Cir. 1999); *Aghoghoubia v. Noel*, 2020 WL 2489727, at *6-7 (E.D.N.Y. May 13, 2020); *Weather v. City of Mount Vernon*, 2011 WL 1046165, at *9 (S.D.N.Y. Mar. 22, 2011), *aff'd*, 474 F. App'x 821 (2d Cir. 2012); *Sash v. United States*, 674 F. Supp. 2d 531, 539-40 (S.D.N.Y. 2009)).

Both sides moved for summary judgment on Earl's excessive force claim against Schultz and Moriarity. Docket Item 5-1 at 12-14 (defendants' motion); Docket Item 16-17 at 6-9 (Earl's motion). The defendants argue that an excessive force claim requires more than a *de minimis* use of force and that because Earl was not injured, Schultz's and Moriarity's use of force was *de minimis* and therefore reasonable. Docket Item 5-1 at 13-14; *see* Docket Item 5-4 at 38 (Earl's deposition) (Q: Were you . . . physically injured during the interaction you had with [Schultz and Moriarity]? A: No.). Earl, on the other hand, argues that "there was absolutely no justification for *any* use of force" because he "clearly . . . posed no threat to the officers." Docket Item 16-17 at 7-9 (emphasis added). And "[w]here there is no need for force," he says, "an officer's use of force is gratuitous, and therefore is constitutionally unreasonable." *Id.*

Judge McCarthy found that the video footage shows that "the effort to gain control of [Earl] (and his phone) lasted mere seconds[,] involved no more than grabbing and pulling[, and] was minimal enough to avoid [Earl] sustaining any injury." Docket Item 35 at 17-19. Moreover, he noted that Earl "is shown—and admits—pulling away from Schultz." *Id.* Judge McCarthy therefore concluded that "[t]his evidence . . . establishes that the *de minim[i]s* use of force . . . was reasonable" and recommended

granting summary judgment for the defendants.  *Id.* at 19-20.[9]  Earl objects to that

recommendation, arguing that Judge McCarthy misconstrued both the video footage

and Earl's statements about his interaction with Schultz.  Docket Item 41 at 7-9.

This Court respectfully disagrees with Judge McCarthy's analysis of Earl's

excessive force claim and finds that neither side is entitled to summary judgment.

The video of the incident shows that Schultz approached Earl, who appeared to

be standing on or near the curb with a cell phone to his ear.  Earl turned to walk away,

but as Schultz approached, Earl turned back and held up his open left hand toward

Schultz, as if either to wave goodbye or—more likely—to indicate that he was on the

phone and did not want to be interrupted.  Earl then turned away from Schultz again

and resumed his walk back toward 37 Schmarbeck.

Schultz then walked toward Earl—who still had his phone to his ear—grabbed

Earl's arm, pulled Earl toward him, and led Earl into the street where the other three

officers were standing.  As they walked, Earl seemed to try to pull his arm away, but he

and Schultz continued to walk together until they stopped near the back of Schultz's

patrol car.  At that point, Schultz appeared to reach for Earl's phone.  Earl may have

turned away slightly—it is difficult to tell—but he did not "pull away" from Schultz.

Moriarity then stepped up to Earl, and Moriarity and Schultz pushed and pulled Earl

back and forth between them.

---

[9] Although Judge McCarthy recommended that the "defendants' motion to dismiss this claim be granted," Docket Item 35 at 20, the defendants relied on material outside the pleadings in their motion, *see* Docket Item 5-1 at 14 (citing Kistner's deposition).  This Court therefore assumes that Judge McCarthy meant to recommend granting the defendants' motion for summary judgment on this claim and construes the R&R as such.

This span of the interaction—from Schultz's approach toward Earl to the end of Schultz's and Moriarity's physical contact with Earl—was quite brief; it lasted no more than 25 seconds.  And the video's angle and low quality make it difficult to say for certain if—or to what extent—Earl resisted the officers.

For that reason, this Court finds—even after viewing the video—that there are unresolved questions of fact as to whether Earl was "actively resisting" the officers, *see Ketcham*, 992 F.3d at 148-49—questions for a jury to decide.  A jury may find that Earl resisted, but it is possible that a jury instead may see Earl's apparent willingness to walk with Schultz as evidence that he was cooperating with the officers.[10]  And depending on what the jury finds, the officers' use of force may or may not have been justified.

The defendants argue that Schultz and Moriarity are protected by qualified immunity "because it cannot be said 'that the force used here was so excessive that no reasonable officer would have made the same choice.'"  Docket Item 43 at 2-3 (quoting *Borowski I*, 2020 WL 6084941, at *11).  But the same factual disputes about Earl's

---

[10] The question of Earl's cooperation distinguishes this case from *Borowski v. Mordino*, 2020 WL 6084941 (W.D.N.Y. July 21, 2020) ("*Borowski I*"), *adopted*, 2020 WL 6083425 (W.D.N.Y. Oct. 15, 2020) ("*Borowski II*").  In *Borowski*, the plaintiff brought an excessive force claim against a customs officer who grabbed her arm and shoulder during a traffic stop.  *Borowski I*, 2020 WL 6084941, at *7.  The magistrate judge concluded that the officer's use of force "was no more than *de minimis*" and recommended granting the officer's motion for summary judgment.  *Id.* at *9.  This Court adopted that recommendation.  *Borowski II*, 2020 WL 6083425, at *1-2.

But in *Borowski*, it was "undisputed" that the plaintiff—who had exited her vehicle abruptly and without warning—did not comply with the officer's repeated directions to return to her vehicle.  *Borowski I*, 2020 WL 6084941, at *7.  Here, on the other hand, Earl says that he cooperated with the officers and complied with their orders.  *See supra* at 10-14.  If that is true, then any force at all—even a *de minimis* use of force—may not have been justified.  *See, e.g., Weather*, 2011 WL 1046165, at *9 ("Under the law, police are not permitted to use any degree of force in all instances—in some circumstances, no use of force is reasonable because none is required.").

actions preclude summary judgment on that score.  If Earl was cooperating, then there

likely was no need for Schultz and Moriarity to push and pull Earl back and forth

between them.  So just as Earl is not entitled to summary judgment based on the video,

neither are the defendants.

Indeed, the Second Circuit has cautioned that "[b]ecause of its intensely factual

nature, the question of whether the use of force was reasonable under the

circumstances is generally best left for a jury to decide."  *Oakley v. Dolan*, 980 F.3d 279,

284 (2d Cir. 2020) (citation omitted).  That guidance certainly applies here, where the

fuzzy video footage and conflicting testimony could allow a jury to draw very different

conclusions about the conduct at issue.

For all those reasons, both sides' motions for summary judgment on Earl's

excessive force claim are denied.

## III.    FAILURE TO INTERVENE

"An officer can be held liable under [section] 1983 for 'the preventable harm

caused by the actions of . . . other officers where that officer observes or has reason to

know that: (1) excessive force is being used, (2) a citizen has been unjustifiably

arrested, or (3) any constitutional violation has been committed by a law enforcement

official.'"  *Kayo v. Mertz*, 531 F. Supp. 3d 774, 799 (S.D.N.Y. 2021) (quoting *Anderson

v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)).

Both sides moved for summary judgment on Earl's failure-to-intervene claim

against McDermott and Velez.  Docket Item 16-17 at 13-15 (Earl's motion); Docket Item

24 at 15 (defendants' motion).  Judge McCarthy recommended that Earl's motion be

denied "[t]o the extent that [Earl] has not established his entitlement to judgment on any

24

of his constitutional claims."  Docket Item 35 at 20-21.  Both Earl and the defendants

objected to Judge McCarthy's analysis, arguing that he should have recommended

granting their respective motions.  Docket Item 40 at 5 (defendants' objections) (arguing

that "[b]ecause the defendant officers have qualified immunity from [Earl's] constitutional

claims, McDermott and Velez have qualified immunity from his failure[-]to[-]intervene

claim"); Docket Item 41 at 7 n.4 (Earl's objections) (arguing that Judge McCarthy "erred

in declining to recommend summary judgment to [Earl] on his unlawful[-]seizure claims"

and thus "equally erred in declining to recommend summary judgment to [Earl] on his

failure-to-intervene claim[]").

But the same questions of fact that preclude summary judgment for either side

on the underlying alleged violations of Earl's constitutional rights preclude summary

judgment on Earl's failure-to-intervene claim.  If the defendants did not violate Earl's

constitutional rights, then McDermott and Velez "cannot be liable for their failure to

intercede in [] non-existent violations."  *See McIntosh v. City of New York*, 722 F. App'x

42, 46 (2d Cir. 2018) (summary order).  But if the defendants are not entitled to qualified

immunity on the underlying claims, then neither are they entitled to qualified immunity

on Earl's failure-to-intervene claim.

Both sides' motions for summary judgment on the failure-to-intervene claim

against McDermott and Velez therefore are denied.

## IV.    FIRST AMENDMENT RETALIATION

"To prevail on [a First Amendment retaliation] claim, [a] plaintiff must prove [that]:

(1) he has an interest protected by the First Amendment; (2) [the] defendants' actions

were motivated or substantially caused by his exercise of that right; and (3) [the]

defendants' actions effectively chilled the exercise of his First Amendment right." *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001).

Both Earl and the defendants moved for summary judgment on Earl's First Amendment retaliation claim. Docket Item 16-17 at 11-13 (Earl's motion); Docket Item 24 at 14-15 (defendants' motion). Judge McCarthy recommended denying Earl's motion, finding that "there are triable issues of fact as to whether Schultz's conduct was motivated or substantially caused by" Earl's call or attempted call to 911. Docket Item 35 at 21-22. Both sides objected to Judge McCarthy's analysis of this claim, arguing that he should have recommended granting summary judgment in their favor. Docket Item 40 at 5-6 (defendants' objections); Docket Item 41 at 9-10 (Earl's objections). This Court agrees with Judge McCarthy that questions of fact remain, however, and overrules both sides' objections.

### A.    Earl's First Amendment Interest

The First Amendment permits the government to restrict speech only "in a few limited areas," including obscenity, fraud, incitement, and "speech integral to criminal conduct." *United States v. Stevens*, 559 U.S. 460, 468-69 (2010) (citations omitted). But "[n]ot all speech is of equal First Amendment importance . . . and where matters of purely private significance are at issue, First Amendment protections are often less rigorous." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (citations and internal quotation marks omitted).

Here, the parties debate whether an attempted 911 call to request an ambulance is protected speech. Earl argues that such a call "plainly does not fit into any category of prohibited or punishable speech" and therefore "is entitled to protection under the

26

First Amendment." Docket Item 16-17 at 12. The defendants counter that Earl "cites no case holding that calling for an ambulance is protected by the First Amendment." Docket Item 24 at 14. Because the First Amendment is meant to "secure the expression of ideas," they say, an ambulance request falls outside its scope of protection. *Id.* (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964)). And, they suggest, an *attempted* call is not only not protected speech, but it is not speech at all. *See* Docket Item 40 at 5.

The first element of a First Amendment retaliation claim is whether the plaintiff "has an interest protected by the First Amendment," not whether he exercised a First Amendment right by actually speaking. *Curley*, 268 F.3d at 73. So for the purposes of Earl's claim, it does not matter whether Earl actually requested an ambulance. Rather, the question is whether he had a First Amendment interest in making such a request. And this Court finds that he did.

The defendants are correct that one purpose of the First Amendment is to protect the expression of ideas. But the Supreme Court has emphasized the breadth of the Free Speech Clause and has noted that aside from a few narrowly defined categories, it protects even speech with little value. *See, e.g.*, *Stevens*, 559 U.S. at 468-70 (rejecting the idea that speech with "minimal redeeming value" is exempt from First Amendment protection). So while Earl's attempted call may not have been criticism of public officials—a typical context for a First Amendment retaliation claim brought by a private citizen, *see, e.g.*, *Williams v. Town of Greenburgh*, 535 F.3d 71, 77 (2d Cir. 2008)—his request did not fall into a category of unprotected speech such as fraud or incitement. Nor does this Court accept the argument that a request for an ambulance to help an

injured individual is entitled to lesser First Amendment protection because it is not a

"matter[] of public concern."  *See* Docket Item 45 at 5 (citing *Snyder*, 562 U.S. at 454).

Earl therefore had a protected interest in communicating his request for an ambulance.

### B.    The Defendants' Motivation

In analyzing the second element of a First Amendment retaliation claim—the

defendants' motivation—the Second Circuit has held that proximity between speech and

an allegedly retaliatory action can establish that the action was substantially caused by

the speech.  *See Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) (noting that the

defendant's issuance of allegedly retaliatory traffic tickets "mere hours" after the plaintiff

submitted a complaint against the defendant "was sufficiently proximate to imply that the

issuance of the tickets was motivated by [the plaintiff's] complaint"); *see also Espinal v.

Goord*, 558 F.3d 119, 129 (2d Cir. 2009) ("A plaintiff can establish a causal connection

that suggests retaliation by showing that protected activity was close in time to the

adverse action.").

Earl alleges that Schultz grabbed him and took his cell phone immediately after—

and only because—Schultz overheard him attempting to call an ambulance.  Docket

Item 16-17 at 12-13.  In fact, Earl testified that Schultz "told [him he] would be arrested if

[he] tried to use [his phone] to call an ambulance again."  Docket Item 5-4 at 28.

Schultz, on the other hand, testified that while he knew that Earl had a cell phone, he

did not know whether Earl "was on it . . . or not."  Docket Item 16-4 at 232.  And the

defendants say that Schultz approached Earl not because Earl was on his phone but

because he would not comply with the officers' orders.  Docket Item 24 at ¶ 14.

Furthermore, the defendants say that Schultz took Earl's phone because Schultz was

concerned for officer safety, not because he wanted to prevent Earl from calling an ambulance.  Docket Item 24 at ¶ 15; Docket Item 40 at 4.

Those starkly different stories raise issues of fact that preclude summary judgment for either side.[11]  This Court therefore denies both sides' motions for summary judgment on Earl's retaliation claim.[12]

## V.    NEGLIGENT HIRING/FAILURE TO SUPERVISE AND TRAIN

To establish liability under section 1983, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (citing *Iqbal*, 556 U.S. at 676).  It is not enough to assert that the defendant is a "link[] in the [entity's] chain of command."  *See McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004) (citation omitted).  Moreover, the theory of *respondeat superior* is not available in a section 1983 action.  *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003). Instead, "[t]he violation must be established against the supervisory official directly." *Tangreti*, 983 F.3d at 618.

---

[11] Although the parties do not address the third element required for a retaliation claim beyond a sentence or two, similar issues of fact surround that element: whether the defendants' actions effectively chilled the exercise of Earl's First Amendment right. *See Curley*, 268 F.3d at 73.

[12] The defendants also argue that "qualified immunity . . . renders the officers immune from [Earl's] First Amendment retaliation claim" because "where police have a legitimate basis for performing an act under the Fourth Amendment . . . , a First Amendment retaliation claim necessarily fails as a matter of law."  Docket Item 40 at 6 (citation omitted).  But because the defendants are not entitled to summary judgment on Earl's unlawful seizure claims based on qualified immunity, *see supra* at 10-19, they are not entitled to summary judgment based on qualified immunity with respect to Earl's First Amendment claims.

Judge McCarthy recommended that this Court grant the defendants' motion to dismiss Earl's section 1983 negligent hiring and failure to supervise and train claim against Lockwood. Docket Item 35 at 22-23. Earl objects to that recommendation, arguing that "rather than engaging with [Earl's] allegations, [Judge McCarthy] simply concluded that *Tangreti* raised the bar for pleading [s]ection 1983 claims against a supervisory official." Docket Item 41 at 10. But *Tangreti* did raise the bar, and this Court agrees with Judge McCarthy that Earl has not adequately alleged Lockwood's personal involvement in the events of January 1, 2017.

Earl argues that he has pleaded "facts that plausibly support the conclusion that [] Lockwood personally was involved in the violation of [Earl's] [c]onstitutional rights." Docket Item 41 at 11. But Earl does not allege that Lockwood was physically present on Schmarbeck Avenue or that he even was aware of the events of January 1, 2017, as they occurred. Instead, to establish Lockwood's personal involvement, Earl relies on 1) Lockwood's testimony about whether the on-scene officers violated BPD policy; 2) Lockwood's testimony about whether he would discipline the on-scene officers; and 3) Lockwood's failure to discipline the on-scene officers. *Id.* (citing Docket Item 34 at ¶¶ 96-98).

This Court does not see how Lockwood's testimony—given more than two years after the incident in question, *see* Docket Item 16-9 at 2—bears on his personal involvement in the events of January 1, 2017. Nor does Earl's claim that Lockwood "tacit[ly] support[ed] his subordinates' actions" by failing to discipline them, Docket Item 41 at 12, establish that Lockwood himself was personally involved in the alleged constitutional violations. Indeed, since *Tangreti*, section 1983 claimants can no longer

rely on the theories of supervisory liability or failure to discipline to establish a supervisor's personal involvement in a constitutional violation.  *See Tangreti*, 983 F.3d at 616 (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).

Earl characterizes *In re New York City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 409-11 (S.D.N.Y. 2021) as an "analogous" case in which the court found that the plaintiffs had plausibly pleaded the personal involvement of supervisory officials who were "involved in the development of tactics employed by the NYPD."  Docket Item 41 at 11-12.  But Earl has not plausibly alleged that Lockwood was involved in developing any tactics used by the on-scene officers here; in fact, Lockwood had not yet been named Commissioner when the incident occurred.[13]

Because Earl has not plausibly alleged Lockwood's personal involvement in the events of January 1, 2017, the defendants' motion to dismiss the section 1983 claims against Lockwood is granted.

## VI.    *MONELL* LIABILITY

A municipality cannot be held liable under section 1983 unless the challenged action was undertaken pursuant to a municipal policy, custom, or practice.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  To hold a municipality liable under section 1983, "a plaintiff is required to plead and prove three elements: (1) an official

---

[13] This Court takes judicial notice that Lockwood did not become BPD Commissioner until January 2018. *See* City of Buffalo Press Release, *Mayor Brown Announces Appointment of Byron Lockwood as Interim Police Commissioner* (Jan. 17, 2018), https://www.buffalony.gov/CivicAlerts.aspx?AID=185; *see also Diaz v. Bowles*, 2022 WL 2047241, at *1 n.2 (D. Conn. June 6, 2022) (taking judicial notice of who was Commissioner at the relevant time); Docket Item 5-1 at 7-8.

policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (citation omitted).

"Absent an express municipal policy, the plaintiff may prove a municipal custom, policy[,] or practice in several ways."  *Ramos v. Cnty. of Suffolk*, 2009 WL 10708571, at *2 (E.D.N.Y. Sept. 8, 2009).  One way is to demonstrate a policymaker's "acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity."  *Jeffes v. Barnes*, 208 F.3d 49, 61 (2d Cir. 2000) (citation omitted).  In limited circumstances, a municipality also may be held liable for its failure to train, supervise, or discipline its employees.  *See Wray*, 490 F.3d at 195 (failure to train or supervise employees may be official policy or custom); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("persistent failure to discipline" employees may show a "policy of ratification of unconstitutional conduct").

But "[w]here plaintiffs seek to hold a municipality liable under a theory of failure to [train,] supervise[,] or discipline, . . . they must also show that the municipal policymaker acted with deliberate indifference."  *Pipitone v. City of New York*, 57 F. Supp. 3d 173, 191 (E.D.N.Y. 2014) (citing *City of Canton v. Harris,* 489 U.S. 378, 388-89 (1989)); *see also Wray*, 490 F.3d at 195 ("The failure to train or supervise city employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." (citation omitted)).  "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (alteration, citation, and internal quotation marks

32

omitted).  "To establish 'deliberate indifference,' a plaintiff must show that: [1] a policymaker knows 'to a moral certainty' that city employees will confront a particular situation; [2] the situation either presents the employee with 'a difficult choice of the sort that training or supervision will make less difficult' or 'there is a history of employees mishandling the situation;' and [3] 'the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.'"  *Wray*, 490 F.3d at 195-96 (citation omitted).

Alternatively, "deliberate indifference may be inferred where the need for more or better supervision to protect against constitutional violations was obvious, but the policymaker fail[ed] to make meaningful efforts to address the risk of harm to [the] plaintiff[]."  *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011) (citations and internal quotation marks omitted).  "While the Supreme Court has left open the possibility that a single incident could give rise to liability for failure to train or supervise, the Court has cautioned that only a 'narrow range' of circumstances would support such single-incident liability, where the 'unconstitutional consequences of failing to train [were] patently obvious.'"  *Schnitter v. City of Rochester*, 931 F. Supp. 2d 469, 475 (W.D.N.Y. 2013), *aff'd*, 556 F. App'x 5 (2d Cir. 2014) (quoting *Connick*, 563 U.S. at 64); *see Connick*, 563 U.S. at 62 ("A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." (citation and internal quotation marks omitted)).

Similarly, the Second Circuit has noted that a policy of acquiescing in or ratifying illegal conduct "cannot be inferred from the failure of those in charge to discipline a single police officer for a single incident of illegality; instead, there must be more

evidence of supervisory indifference, such as acquiescence in a prior pattern of conduct." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 306 (2d Cir. 2020) (citation and internal quotation marks omitted).  Indeed, courts in the Second Circuit routinely dismiss claims based only on a single instance of failing to discipline an employee after an alleged unconstitutional event.  *See, e.g.*, *Santiago v. City of Rochester*, 2022 WL 856780, at *4 (W.D.N.Y. Mar. 23, 2022) (failure to discipline employee "after the incident does not, standing alone, . . . 'give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell*'" (quoting *Batista*, 702 F.2d at 397)); *Askew v. Lindsey*, 2016 WL 4992641, at *5 (S.D.N.Y. Sept. 16, 2016) (collecting cases holding that a singular failure to discipline "cannot give rise to an inference of deliberate indifference without further evidence of a municipal policy or practice").

The defendants moved to dismiss Earl's section 1983 claims against the City of Buffalo, arguing that he "failed to plead properly a municipal liability claim."  Docket Item 5-1 at 8-12.  Judge McCarthy declined to address the merits of the defendants' argument, instead recommending that their motion be denied as moot "[b]ecause [Earl] ha[d] since been granted leave to file an [a]mended [c]omplaint."  Docket Item 35 at 24. And Earl in fact filed an amended complaint incorporating details about BPD's investigation into the January 2017 incident in support of his *Monell* claim.  *See* Docket Item 34 at ¶¶ 46-54.  For that reason, this Court briefly addresses whether Earl's amended complaint sufficiently alleges that the City of Buffalo is subject to *Monell* liability and concludes that it does.

Earl's *Monell* liability argument largely mirrors the *Monell* liability argument made by his father, James, in James's action against the defendants.  Like James, Earl claims that the City has "an informal policy or custom that allows Schultz and other BPD officers to violate the civil rights of others without any serious consequences."  Docket Item 16-17 at 20-23; *see Kistner*, 2022 WL 16797986, at *15.  Like James, to establish that policy or custom, Earl principally relies on the alleged failure to properly investigate and discipline the officers who allegedly violated his constitutional rights.  *See* Docket Item 34 at ¶¶ 46-54; *Kistner*, 2022 WL 16797986, at *15.  And as in James's case, the details surrounding the investigation into the incident on January 1, 2017, are sufficient to raise a reasonable inference that the City of Buffalo has or had a custom or practice that might justify the imposition of *Monell* liability.  *See Kistner*, 2022 WL 16797986, at *15-*16.

First, Lockwood acknowledged that James's Notice of Claim surrounding the events of January 1, 2017, should have triggered an Internal Affairs investigation.  Docket Item 19-6 at 250-53.  But no such investigation began until after a local television station reported on the incident more than two-and-a-half years after James filed his Notice of Claim.  *Id.*  Second, in that television report, Captain Jeff Rinaldo, Lockwood's chief of staff and a spokesman for his office, was interviewed and incorrectly said that an Internal Affairs investigation *had* been opened by the time of the report; Rinaldo also said that opening an Internal Affairs investigation is "customary practice any time there's some type of civil litigation concerning a Buffalo police officer."  *Id.* at 141-43.

While the specifics of the investigation differ with respect to James and Earl, Lockwood testified that the on-scene officers did not follow BPD procedure in their interaction with Earl.  Specifically, Lockwood said that the officers' physical interactions with Earl were "inappropriate," that the officers "shouldn't have" touched Earl as they did, and that—based on the video—the interaction "doesn't look good."  Docket Item 16-9 at 205-07, 212.  He also said that it was a violation of BPD procedure and not "appropriate" for the officers to take Earl's cell phone and that officers generally should not take an individual's cell phone unless it is "used in a crime."  *Id.* at 207-08, 210.

Lockwood even admitted that he had not seen the video of the interaction between Earl and the defendants until his deposition.  *Id.* at 207.  But when asked whether he would discipline the on-scene officers after seeing the video, Lockwood said that he would "have to go back and look at the file" to determine whether discipline was appropriate—even though he also said that the officers' conduct was not.  *Id.* at 210-11.

As in James's case, "[this] series of events is sufficient to support an inference that Lockwood ratified the officers' actions and that the City was deliberately indifferent in supervising and disciplining BPD officers or had an informal policy of not disciplining its officers."  *See Kistner*, 2022 WL 16797986, at *15-*16.  Indeed, it would be incongruous to find that one plaintiff had plausibly stated a claim supporting *Monell* liability while another plaintiff—making nearly identical allegations regarding the City's role in the same incident and relying on nearly identical evidence—had not.  For all those reasons, the defendants' motion to dismiss Earl's *Monell* claims against the City of Buffalo is denied.

## VII.   ASSAULT AND BATTERY

Both sides moved for summary judgment on Earl's state law assault and battery claims.  The defendants argue that these claims should be analyzed under the same "objective reasonableness" standard as Earl's excessive force claim and that they are entitled to summary judgment for the same reasons.  *See* Docket Item 24 at 9-10.  But Earl argues that there is no "*de minimis* exception to [a state law claim for] assault and battery," unlike a section 1983 excessive force claim, suggesting that even if he is not entitled to summary judgment on his claim of excessive force, he still is entitled to summary judgment on his state law claims for assault and battery.  *See* Docket Item 16-17 at 17-18.

In the R&R, Judge McCarthy noted that under New York law, "where a seizure is determined to be 'unlawful, any use of force against a plaintiff may constitute an assault and battery, regardless of whether the force would be deemed reasonable if applied during a lawful arrest.'"  Docket Item 35 at 24-25 (quoting *Boyler v. City of Lackawanna*, 287 F. Supp. 3d 308, 325 (W.D.N.Y. 2018), *aff'd*, 765 F. App'x 493 (2d Cir. 2019)); *see also Colon v. City of Rochester*, 419 F. Supp. 3d 586, 599 (W.D.N.Y. 2019) ("Under New York law, however, the use of *any* force during the course of an unlawful arrest gives rise to assault and battery claims against the arresting officer." (emphasis in original) (collecting cases)); *Rucks v. City of New York*, 96 F. Supp. 3d 138, 152-53 (S.D.N.Y. 2015) ("[I]f an arrest is determined to be unlawful, any use of force against a plaintiff may constitute an assault and battery, regardless of whether the force would be deemed reasonable if applied during a lawful arrest.").[14]  And "[g]iven the open

---

[14] This Court agrees with Judge McCarthy that although these cases arose in a false-arrest context, their reasoning applies to unlawful *Terry* stops because a battery is

question" on Earl's illegal seizure claim, Judge McCarthy recommended denying both sides' motions for summary judgment on the assault and battery claims.  Docket Item 35 at 26.  Both sides then objected, arguing that Judge McCarthy erred in denying summary judgment on this claim for the same reasons that he erred in denying summary judgment on Earl's illegal seizure claim.  Docket Item 40 at 7 (defendants' objections); Docket Item 41 at 7 n.3 (Earl's objections).

This Court agrees with Judge McCarthy.  It is clear that "the use of *any* force during the course of an unlawful arrest gives rise to assault and battery claims against the arresting officer."  *Colon*, 419 F. Supp. 3d at 599 (emphasis in original).  So because the legality of the officers' seizure of Earl has yet to be determined, both sides' motions for summary judgment on the assault and battery claims are denied.

## CONCLUSION

For the reasons stated above, the plaintiff's motion for summary judgment, Docket Item 16, is DENIED, and the defendants' motions for judgment on the pleadings and for summary judgment, Docket Items 5 and 24, are DENIED in part and GRANTED in part.  The following claims may proceed:

- Earl's unlawful-seizure claim against Schultz, Moriarity, McDermott, and Velez as it relates to the seizure of his person and his property;

- Earl's excessive-force claim against Schultz and Moriarity;

---

"intentional *wrongful* physical contact with another person without consent."  Docket Item 35 (emphasis added) (quoting *Sulkowska v. City of New York*, 129 F. Supp. 2d 274, 294 (S.D.N.Y. 2001)).  The only difference in a *Terry* stop context is that a defendant need show only that he had reasonable suspicion to stop the plaintiff rather than that he had probable cause to arrest him.

- Earl's failure-to-intervene-claim against McDermott and Velez;

- Earl's First Amendment retaliation claim against Schultz, Moriarity, McDermott, and Velez;

- Earl's *Monell* claims against the City of Buffalo; and

- Earl's assault and battery claims against Schultz, Moriarity, and the City of Buffalo.

The following claims are dismissed:

- Earl's Fourteenth Amendment unlawful-seizure claim; and

- Earl's section 1983 claims against Lockwood.

The case is referred back to Judge McCarthy for further proceedings consistent with the referral order of June 8, 2021, Docket Item 7.


SO ORDERED.


Dated:        January 10, 2023
              Buffalo, New York


                                  */s/ Lawrence J. Vilardo*
                                  LAWRENCE J. VILARDO
                                  UNITED STATES DISTRICT JUDGE